# Illinois Official Reports

## Appellate Court

***Stump v. Swanson Development Co.*, 2014 IL App (3d) 110784**

| | |
|---|---|
| Appellate Court Caption | ROBERT F. STUMP, MARY RITA STUMP, CHICAGO TITLE LAND TRUST COMPANY, an Illinois Corporation, as Trustee Under Trust Agreement Dated May 31, 1968 and Known as Trust Number 38021, Plaintiffs-Appellees and Cross-Appellants, v. SWANSON DEVELOPMENT COMPANY, LLC, an Illinois Limited Liability Company; MUNICIPAL TRUST AND SAVINGS BANK, as Trustee under Trust Agreement Dated December 15, 2004 and Known as Trust Number 1894; PEOTONE PROPERTIES, LLC, as Illinois Limited Liability Company; MUNICIPAL TRUST & SAVINGS BANK, as Trustee Under Trust Agreement Dated June 25, 2007 and Known as Trust Number 2184; MOKENA INVESTMENT COMPANY I, LLC, an Illinois Limited Liability Company; DONALD L. SWANSON, SR.; and DONALD SWANSON, JR., Defendants-Appellants and Cross-Appellees (Municipal Trust and Savings Bank, Defendant-Appellee). |
| District & No. | Third District<br>Docket Nos. 3-11-0784, 3-11-0785, 3-11-0886 cons. |
| Filed | February 10, 2014 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In an action for fraud, breach of contract, an accounting and rescission of agreements arising from several real estate developments in which plaintiffs provided real estate to be developed by defendants, the appellate court upheld the portions of the trial court's judgment finding defendants personally liable for fraud in the inducement and compensatory damages, rescinding an oral agreement as to one of the parcels involved and awarding punitive damages, and after rejecting plaintiffs' argument that the doctrine of a vendor's lien should be applied to give them priority over defendant bank's mortgages, the trial court's judgment allowing the bank to proceed with the foreclosure of their mortgages was also affirmed. |

| Decision Under Review | Appeal from the Circuit Court of Will County, No. 08-CH-5325; the Hon. Bobbi N. Petrungaro, Judge, presiding. |
|---|---|
| Judgment | No. 3-11-0784, Affirmed. |
| | Nos. 3-11-0785 and 3-11-0886, Affirmed and remanded. |
| Counsel on Appeal | Donald L. Swanson, Sr., and Donald L. Swanson, Jr., of Peotone, appellants *pro se*. |
| | Scott M. Hoster, of Dystrup, Hoster & Jarot, P.C., of Joliet, and Kendra Karlock (argued), of Bourbonnais, for appellee Municipal Trust & Savings Bank. |
| | James A. Murphy and R. Peter Grometer, both of Mahoney, Silverman & Cross LLC, of Joliet, and Henry B. Vess III (argued), of Henry B. Vess III, P.C., of Chicago, for other appellees. |
| Panel | JUSTICE McDADE delivered the judgment of the court, with opinion. |
| | Justices Lytton and Schmidt concurred in the judgment, with opinion. |

**OPINION**

¶ 1    This case involves cross-appeals from the decision of the circuit court of Will County resolving multiple claims and cross-claims of breach of contract and fraud, and seeking accounting and rescission of legal agreements in conjunction with three real estate development projects in Peotone, Frankfort, and Mokena–all of which are in Will County, Illinois. We affirm and remand for further proceedings, if necessary, consistent with this opinion.

¶ 2                                    FACTS

¶ 3    Plaintiff Robert Stump entered into three real estate development projects with defendants, Swanson Development Company, LLC, Donald Swanson, Sr., and his son, Donald Swanson, Jr. Pursuant to the agreements reached by the parties, Stump was to provide the property for the

- 2 -

developments in return for specified purchase prices, while the Swansons were to facilitate the projects using their real estate expertise and experience.

¶ 4    The first development was the Glenview project, which was to build single-family residences in Peotone. In November 2004, the Swansons formed Peotone Properties, LLC. Donald Jr. and Patrick O'Malley, Stumps' grandson/attorney, were each 50% owners; however, Stump was not a member of that company. In December 2004, the parties entered into the "Glenview Land Development Agreement," which provided that Stump would contribute property and convey free and clear title to his land so it could be used as collateral for bank loans necessary to undertake this development project. Ultimately, eight homes were built on Glenview land, and six homes were sold with gross sales at $1,690,000.

¶ 5    The parties next planned to develop property Stump owned in Frankfort to create a larger community of single-family residences. Stump and Donald Sr. entered into agreements (Prairie Creek I and II) that called for a payment of $1,460,250 by December 31, 2007, in exchange for unencumbered title to 58 acres of land in unincorporated Will County. The payment was to be made by Swanson Development Company, LLC, which was Swansons' operating company. Donald Sr., his mother, Valerie, and Donald Jr. were members of that company. Donald Jr. was the manager; Stump was not a member. Pursuant to their agreement, Stump conveyed, without any restrictions, title to the Frankfort property to a trust (trust agreement 1894) created by Swanson and managed by Municipal Trust and Savings Bank, of which Peotone Properties, LLC, is the sole beneficiary. Loan proceeds moved through Peotone Properties to Swanson Development. Defendants borrowed $1,600,000 against the Frankfort property and spent virtually all of that money. Stump received none of his purchase price, nor were all of the loan proceeds devoted to the Frankfort project. Development was not completed.

¶ 6    The third project was the development of property in Mokena. Donald Sr. obtained an initial land plan for that property in late 2006. On July 19, 2007, Donald Sr.–while actively negotiating with Stump about the creation of a limited liability company (LLC) in which Stump would hold a 50% interest and a written contract for this transaction–preemptively formed a LLC called Mokena Investment Company I, in which he and his son were the only members, each holding a 50% interest. Swanson and Stump never did enter into a written agreement with respect to the Mokena property, but an oral agreement provided for Stump to be paid a total of $4,500,000 for the property: $500,000 payable at the loan closing, $500,000 upon approval of the final plat of the subdivision, and $35,000 per unit upon closing of each sale. On August 14, 2007, Stump and the Swansons attended a loan closing for the Mokena property. After the closing, Stump was given a check for $333,000, and $167,000–the balance of the first $500,000–was paid by Swanson Development on behalf of Stump to ComEd for the installation of underground utilities. Stump received no further payment for his Mokena property.

¶ 7    In December 2007, Swanson Development failed to make the $1,460,250 payment due to Stump under the Frankfort development agreement. Approximately 60 days later, Stump told Donald Jr. that "this is over with" and that he "wanted out."

¶ 8       Between November 2004 and February 2008, using Stump's land as collateral and using Peotone Properties and Mokena Investment Company I as beneficiaries, Swanson Development borrowed a total of $4,100,000 from Municipal Trust & Savings Bank in connection with all three of the projects. The funds from loans on these properties were deposited into one Swanson Development checking account on which Donald Sr. and Donald Jr. were the only signors. All of the loan proceeds were spent, but Stump was paid nothing for the Frankfort property and only $500,000 of the $4,500,000 owed him on the Mokena property. Donald Sr. personally received in excess of $351,652 from the loan proceeds and bought a luxury car. Donald Jr. received in excess of $74,600. A January 2008 accounting of the Mokena property shows Donald Sr. received $409,900 and Donald Jr. received $89,900. O'Malley, whom Stump wanted to share in the Peotone and Frankfort profits, received over $120,000. Despite the significant loan proceeds, no development was created in either Frankfort or Mokena.

¶ 9       Plaintiffs Robert Stump, Mary Rita Stump and Chicago Title Land Trust Company (Stump) filed an 11-count complaint against defendants Swanson Development Company, LLC; Donald Swanson, Sr.; Donald Swanson, Jr.; Mokena Investment Company I, LLC; Peotone Properties, LLC, and Municipal Trust and Savings Bank, as trustee of trust agreements 1894 and 2184, seeking the following relief: accounting on the Peotone property against Swanson Development (count I); rescission and other equitable relief based on fiduciary fraud against Swanson Development, the Swansons and the bank (count II); rescission and other equitable relief based on breach of contract on the Frankfort property against Swanson Development, the Swansons and the bank (count III); declaration of an equitable lien on the Frankfort property against Swanson Development and the bank (count IV); breach of contract claim (count V); breach of a personal guaranty on the Frankfort property against Donald, Sr. (count VI); breach of the reimbursement agreement on the Ruder property against Donald Sr. (count VII); rescission and other equitable relief based on fiduciary fraud on the Mokena property against Swanson Development, the Swansons and the bank (count VIII); rescission and other equitable relief based on breach of contract on the Mokena property against Swanson Development Company, the Swansons and the bank (count IX); unjust enrichment on the Mokena property against Swanson Development, Mokena Investment Company I, LLC, and the Swansons (count X); and promissory estoppel on the Frankfort property against Swanson (count XI).

¶ 10      The Swansons and their LLCs filed a counterclaim against Stump, seeking a setoff for Glenview and Prairie Creek (count I); a setoff in relation to the Mokena property (count II); and alleging, in the alternative, breach of contract related to the Glenview project (count III); breach of contract in relation to the Frankfort project (count IV); and fraud in relation to the Frankfort property (count V). Count VI alleged breach of an oral contract with respect to the Mokena property and count VII alleged fraud in relation to the Mokena property.

¶ 11      Municipal Trust and Savings Bank also counterclaimed against the Swansons and their LLCs, Stump, and the trusts to foreclose mortgages on the Mokena property, the Frankfort property, and three lots in the Glenview project in Peotone.

¶ 12    A 10-day bench trial was held in September 2010, and the following testimony pertinent to the viable issues in this appeal was elicited.

¶ 13    Donald Jr. testified that he, Donald Sr., and Stump were involved in the three development projects between 2004 and early 2008. Swanson Development was the named developer on all of the projects. He was a member and the manager of Swanson Development even though he had no real estate development experience. He signed agreements on behalf of Swanson Development and undertook general management functions, but he never took any action unless authorized and directed by his father and he did not prepare any of the documents he signed.

¶ 14    Swanson Development/Swansons created additional LLCs in conjunction with the projects–Peotone Properties for Peotone and Frankfort, and Mokena Investment Company I for Mokena. Donald Jr. and Patrick O'Malley, Stump's grandson and attorney, were the only members of Peotone Properties. Donald Sr. and Donald Jr. were the only members of Mokena Investment Company I. Donald Jr. was the only common member of all of the LLCs; Stump was not a member of any, nor was he a signor on the single checking account designated to receive the loan proceeds and make distributions.

¶ 15    In his testimony, Donald Jr. confirmed that loan proceeds secured by the Frankfort and Mokena properties were to be used for the development of the specific property. He thought that he and/or Donald Sr. had provided that assurance to Stump directly during the negotiations on the Mokena project. There was nothing in any of the agreements to lead Stump to believe otherwise. However, this restriction had not been honored. All loan proceeds went into one account and were used as needed on all of Stump's projects as well as on other development projects in which Stump had no interest.

¶ 16    In May 2006, Stump was expressing concern about the continued viability of the projects. At a meeting with Stump during negotiations, Donald Sr. indicated that he would personally guarantee the purchase price of the Mokena property. Donald Jr. sent O'Malley an email confirming the offer of a personal guarantee. Although $1,600,000 was borrowed using Frankfort property as collateral and all of that money was spent, water and sewer were never installed and without them, there could be no final approval and the Frankfort development was not completed. Pursuant to the Prairie Creek agreements, Stump was to be paid $1,460,250 for the Frankfort property by December 31, 2007; he was never paid by Swanson Development or personally by Donald, Sr.

¶ 17    In negotiating the Mokena project, Stump was assured by both Swansons that a development agreement documenting the sale/purchase of the property would be completed immediately after the loan closing. That document was never completed and signed. During the negotiations, Stump was also assured that an operating agreement for an LLC which would receive the Mokena loan proceeds and in which he would have a 50% interest would be finalized after the closing. Instead that LLC was formed prior to the closing with Donald Sr. and Donald Jr. as its only members. Stump had no interest.

¶ 18    Donald Sr. testified that he met Stump in October 2003 and they began to develop the property owned by Stump in Peotone. That project was marginally successful and while it was ongoing, they began to explore developing property Stump owned in Frankfort and in Mokena.

He testified with regard to both the Frankfort and Mokena development projects that Stump understood that the property was to be used as collateral for land development and construction loans which required transfer of good and merchantable title. Stump never indicated to him that he was intending to reserve a lien on the property and had he done so, the project could not have gone forward. Unlike Donald Jr., he denied that Stump was ever told that the use of loan proceeds would be limited to the property serving as collateral for each loan.

¶ 19 In conjunction with underwriting the loans, the bank requested, and Donald Sr. prepared and provided, several significantly different personal financial statements, two of which were dated December 31, 2005, but showed different total assets of $4,603,000 and $8,230,000. In January 2008, Stump was worried because he had not been paid for the Frankfort property the preceding month and he asked for the personal financial statements. Swanson gave them to him to "calm him down." The trial court's order recited: "Although Swanson testified that he considered the financial statements to be meaningless, he then testified that he intended those financial statements to mean something to Stump."

¶ 20 In providing support for the Frankfort loans, Donald Sr. signed copies of operating agreements for Peotone Properties, Swanson Development, and Prairie Creek II as manager, even though he was not the manager for any and he had no membership interest in Peotone Properties.

¶ 21 Prior to the closing on the $2,500,000 Mokena line of credit, Donald Sr. and Stump had an oral agreement for the sale of the property for $4,500,000. The owner of the property would be trust No. 2184, but Stump was not a beneficiary of the trust. Instead, he was to have a 50% interest in the LLC that was the beneficiary of the trust and the recipient of the loan proceeds. Mokena Investment Company I, LLC was formed but Stump was not a member. Donald Sr. explained that the LLC had been formed prior to the closing because timing was essential. He could not remember why he and Donald Jr. were the only members and Stump had not been included.

¶ 22 Robert Stump described the nature and parameters of the development projects and testified that he was aware of the fact that his property was being used as collateral for loans. He knowingly conveyed merchantable title for that purpose, but his obligation to do so was conditioned on the agreement of all parties that he would be paid. He had been told the loan proceeds would be used only for the property that secured them. If he had known the Frankfort proceeds would not be restricted in that way, he would not have signed the Prairie Creek agreements. That said, he generally took no interest in where the money was coming from or the specifics of how it was being used. He believed the land was his only contribution to the developments.

¶ 23 He became concerned, however, that the Frankfort property was not being developed and he was getting involved in the Mokena project which would require a lot of money. So he sought reassurance about the Swansons' individual worth by getting personal financial statements from them. He relied on and was reassured by the financial statements even though he did not believe they were completely credible.

¶ 24 Stump testified that prior to the closing on the Mokena property, he and Donald Sr. decided to hire an attorney to form a limited liability company in which the two of them would hold

equal 50% interests. After meeting with the attorney and failing to come to an agreement on terms, there was no further discussion of the matter, and the company was never formed. Stump had no knowledge that the Swansons had created Mokena Investment Company I, LLC, prior to the August 2007 loan closing, with only Donald Sr. and Donald Jr. as members and with Stump having no interest.

¶ 25      In 2007, Stump was interested in purchasing property in Peotone owned by Irv Ruder. He entered into an agreement for an exchange for the property. Stump paid $30,000 earnest money, intending to pay the balance for the property after he received payment from the Swansons on the Frankfort project. When Stump became concerned that he might not have the money to pay Ruder by the closing date, Donald Sr. assured him that he would be paid in ample time, but that he would personally reimburse Stump the $30,000 earnest money in the event he was not. Earlier, in May 2006, Donald Sr. had orally personally guaranteed the purchase price on the Frankfort property. Stump did not receive either the purchase price due him on the Frankfort property or the guaranteed personal payments from Donald Sr., he was unable to complete the sale on the Ruder property, and he lost his earnest money.

¶ 26      Patrick O'Malley is Stump's grandson. He had been out of law school for about a year at the time he began representing his grandparents on the Peotone project. He had no experience in real estate development. He drafted the operating agreement for Peotone Properties in which he and Donald Jr. were equal members. As a member, he believed his consent was necessary to take out loans against the Peotone and Frankfort properties. He also drafted the Glenview Agreement setting out the Peotone project terms. Pursuant to that agreement, he received payments from Swanson Development.

¶ 27      O'Malley drafted both Prairie Creek agreements which transferred title to the Frankfort property without monies being paid to Stump. Under the agreements, the purchase price for Frankfort is to be paid by Swanson Development. Both allow the property to be used as collateral for loans.

¶ 28      In a May 2006 meeting, Donald Sr. represented to Stump that he would personally guarantee the Frankfort purchase price. O'Malley sent an email to Donald Jr., expressing Stump's happiness with the personal guarantee. He thought that email confirmed and accepted the personal guarantee. When he drafted Prairie Creek II it included reference to the meeting but not the personal guarantee.

¶ 29      O'Malley was to share in the profits from Peotone and Frankfort, but not Mokena. With regard to Mokena, Donald Sr. hired an attorney, Jeff Stahl, to draft an operating agreement for an LLC in which Stump was to be a member and an agreement for purchase and sale of the Mokena property. Drafts of those documents were sent to O'Malley who had concerns but apparently did not express them to Stahl. Stump retained another attorney with more experience to help O'Malley with those agreements. Because of his unresolved concerns, O'Malley advised Stump not to sign the contract. Stump did not seek his advice about delivering the deed and O'Malley did not know that Stump had delivered the Mokena deed without the contract or operating agreement having been signed.

¶ 30    Stump told O'Malley about a project in which Donald Sr. was involved on land owned by Irene Petratos. He told his grandson that he was disappointed at having no participation in the Petratos project.

¶ 31    O'Malley drafted the deed in trust that conveyed all of Stump's interest in the Frankfort property without restriction and giving beneficial interest to Peotone Properties. He did not draft mortgages against either the Frankfort or Mokena property because he thought they were not necessary. He did not think Stump wanted the general public to know he retained an interest in the properties. He acknowledged that no equitable interest is reflected in the deed or in Prairie Creek I and II.

¶ 32    Merlin Karlock, president of Municipal Trust & Savings Bank, testified. Pursuant to bank policy, Karlock and Catherine Boicken were, together, to approve loans made by the bank. In addition to his position as president of the bank, Karlock is the sole appraiser for Midwest Appraisal Services. In that capacity, he performed an appraisal on the Mokena property, valuing it at $6,860,700. He had also appraised the Frankfort property in 2006 and assessed its value at $2,044,350. When, as here, Karlock appraised the land offered as loan collateral, he did not participate in the underwriting of or the vote on the loan because of the resulting conflict and Catherine Boicken was solely responsible for validating the loan. When Boicken is acting alone, she is not authorized to make loans greater than $2 million.

¶ 33    Another real estate appraiser, Joseph Batis, valued the Mokena property at $8,160,000. This was the only appraisal he had ever done for the bank and Catherine Boicken was his contact person.

¶ 34    Catherine Boicken, vice president of Municipal Trust & Savings Bank, testified that she was responsible for the Frankfort and Mokena loans at issue in the case. She reported that the trust beneficiary of the Frankfort property was Peotone Properties, and the trust beneficiary of the Mokena property was Mokena Investment Company I. She reviewed operating agreements for both companies and Stump did not appear as a member of either company.

¶ 35    The Frankfort property had been appraised by Karlock at $2,044,350 and had been sold for $1,460,000. The bank made three loans on it: one for $350,000 on January 5, 2005; a refinance in July 2005, for $800,000; and a second refinance in June 2006, for $1,650,000. Before making any loans on the Frankfort property, Boicken commissioned a title search and obtained personal financial statements from the Swansons. In one of those statements Donald Sr. listed his net worth at $3,048,000 with no liabilities. Donald Jr. listed a net worth of $595,000 with no liabilities. After checking their credit reports, Boicken determined that the information they had provided her was inaccurate. She secured additional personal financial statements from and credit reports about the two Swansons which provided still more conflicting financial information and further suggested a general lack of credit-worthiness. She was not, however, unduly concerned about this because of her belief that as long as the value of the property was sufficient to cover the loans and her mortgage liens had priority, the personal financial statements were superfluous. Before the Mokena loan was made, the value had been appraised at $8,160,000 and $6,860,770. The transfer deed showed that the property had been sold to Swanson Development for $4,500,000. Boicken testified that she had never heard of a vendor's lien.

¶ 36 James Downs, Stump's expert, testified that the bank did not follow prudent underwriting standards with respect to the Frankfort and Mokena loans. He opined that the bank should have properly done its due diligence on the borrower, the net worth and the composition of the trust. He also thought the bank should have determined how the property was deeded into trust, how the borrower obtained the properties involved and looked at the companies and their membership. He acknowledged that there was no documentation of a lien by Stump on either the Frankfort or Mokena property. He did not believe the bank had an obligation to ensure that Stump got paid.

¶ 37 Myles Jacobs, a real estate attorney and opinion witness for the bank, testified that Stump should have recorded liens or taken mortgages on the Frankfort and Mokena properties, thereby providing notice to the world that he held an interest. Absent such a lien, there was nothing in the Frankfort or Mokena deeds to show that Stump retained any kind of interest in those properties. Anyone looking at the deeds would have no notice of an interest held by Stump. Had there been such notice of Stump's interest in the record, a lender would have a duty to inquire further before proceeding with any transaction.

¶ 38 At the conclusion of the trial, the court entered a 46-page, single-spaced order which thoroughly set out the facts underlying all of the transactions among the parties and analyzed the legal issues presented, and made the following findings, which we state here in cursory fashion. Any additional facts necessary for consideration of those issues that remain for resolution in this appeal will be incorporated in this order where appropriate.

¶ 39 The trial court found that plaintiffs had failed to meet their burden of proof on counts I, II, VI, X and XI of their complaint and entered judgment on those counts in favor of the Swanson defendants. On counts III (breach of contract on Frankfort), IV (equitable lien on Frankfort), and V (breach of contract), the court entered judgment in favor of plaintiffs and against Swanson Development and Peotone Properties, placing an equitable lien against those defaulting defendants in the amount of $1,460,250. Judgment was, however, also entered in favor of Municipal Trust and Savings Bank on counts III and IV, enabling foreclosure of the bank's liens. On count VII (breach of reimbursement agreement on Ruder), the court found in favor of plaintiffs and ordered Donald Sr. to reimburse Stump the lost $30,000 earnest money deposit. The trial court entered judgment in favor of plaintiffs on counts VIII (fiduciary fraud on Mokena) and IX (rescission of contract and deed on Mokena), assessing compensatory damages, jointly and severally, against Swanson Development, Mokena Investment Company I, LLC, and the Swansons personally in the amount of $2,612,216.57, and awarding $250,000 each in punitive damages against Donald Sr. and Donald Jr. on count VIII.

¶ 40 The trial court found no merit to the counterclaim filed by the Swanson defendants and ruled against these counterclaim plaintiffs on all counts.

¶ 41 With respect to the bank's counterclaim to foreclose, the court found that the bank had satisfied its burden of proof that it was a *bona fide* actor and entered judgment of foreclosure on all of the properties at issue.

¶ 42 All of the Swanson defendants–companies and individuals–filed a notice of appeal from the circuit court's order by counsel. The Stumps cross-appealed, alleging errors related to the Swanson defendants and to Municipal Trust and Savings Bank. A flurry of procedural activity

ensued in this court. Counsel for the Swanson defendants sought and was granted leave to withdraw on the ground that irreconcilable differences had led to a termination of the attorney/client relationship. The docketing schedule was adjusted to give these defendants time to retain new counsel to prepare a brief or to notify the court that they were proceeding *pro se*.

¶ 43 Thereafter, Donald Sr. and Donald Jr. entered appearances *pro se*. No appearances of counsel for the company defendants were filed.

¶ 44 The deadline for filing the Swanson companies' brief passed and Stump moved to dismiss the appeal of these defendants for want of prosecution or failure to comply with appellate rules. Donald Sr. and Donald Jr. acquiesced in the motion, and it was granted. There now being no challenge by the companies and the trusts to the trial court's order, judgment of the circuit court as to them is unopposed and final.

¶ 45 Stump then sought and was granted dismissal of the cross-appeal against the Swanson defendants but preserved the consolidated appeals as to Municipal Trust and Savings Bank, challenging the decisions (1) finding the bank had the right to foreclose its mortgages and (2) authorizing sale and confirming sale of the property to the bank.

¶ 46 In the wake of this procedural housecleaning, the issues remaining to be resolved in this appeal are: issues related to Stump's consolidated appeals as to Municipal Trust and Savings Bank and issues of personal liability raised by Swansons Sr. and Jr.

¶ 47                                                    ANALYSIS
¶ 48                           I. The Swanson Appeal–Personal Liability–Appeal No. 3-11-0784
¶ 49 The Swansons filed an appeal challenging three decisions of the trial court, claiming that (1) Stump failed to prove all of the elements of fraud in the inducement as alleged in count VIII; (2) Stump failed to prove failure of substantial performance/breach of contract as alleged in count IX; and (3) the award of punitive damages against them individually was not warranted.

¶ 50 Donald Sr. and Donald Jr. ask this court to find that "the trial court's findings of fraud and breach of contract with respect to the Mokena project (counts VIII and IX) were against the manifest weight of the evidence." The judgment on counts VIII and IX was entered jointly and severally against Swanson Development Company LLC, Mokena Investment Company I, LLC, and Municipal Trust and Savings Bank, as trustee of trust No. 2184, as well as the two individual Swansons. The court specifically noted that Donald Sr. and Donald Jr. were "agents of SDC." It is their actions and omissions on which the liability of the company defendants is based. We consider whether the evidence was sufficient for the trial court to conclude that the Swansons personally committed fraud.

¶ 51 Our standard for reviewing the trial court's factual findings following a bench trial is whether the findings were against the manifest weight of the evidence. A finding is against the manifest weight when "the opposite conclusion is clearly evident or the finding is arbitrary, unreasonable, or not based in the evidence." *Samour, Inc. v. Board of Election Commissioners*, 224 Ill. 2d 530, 544 (2007). A trial court's legal conclusions are reviewed *de novo. Samour,*

*Inc.*, 224 Ill. 2d at 541-42.

¶ 52                                    A. Personal Liability for Fraud

¶ 53     The factual underpinning[1] for the court's conclusion that the Swansons could be held personally liable for fraud is its finding that "Swanson and DJ undisputedly proceeded with the bank loans and on the closing without disclosing to Stump the existence of MIC and without including Stump in MIC as a member."

¶ 54     The Swansons argue that the trial court's findings that "Stump did not have all the facts" and that their actions with respect to Stump were "fraudulent in nature" were against the manifest weight of the evidence. They further argue that plaintiffs failed to prove they had a special or fiduciary relationship with Stump.

¶ 55     Stump responds that it was not necessary to establish a fiduciary relationship to prove fraudulent inducement. He further responds that the evidence shows that the Swansons made three affirmative misrepresentations to him with respect to the Mokena property: (1) that the money borrowed against the Mokena property would be spent only on that project; (2) that they would enter into a written LLC operating agreement with Stump as a 50% member immediately after the closing; and (3) that they would enter into a written purchase and sale agreement for the Mokena property.

¶ 56     To prevail on an action for fraud, a plaintiff must establish by clear and convincing evidence (1) a false statement of material fact; (2) knowledge by defendant that the statement is false; (3) intent to induce the other party to act; (4) reliance by plaintiff on that misrepresentation; and (5) injury caused by that reliance. *Hassan v. Yusuf*, 408 Ill. App. 3d 327, 343 (2011). Fraud may be perpetrated by a misrepresentation or by concealment. *Id*.

¶ 57     For fraud in the inducement, the defendant must have made a false representation of a material fact knowing or believing it to be false and doing it for the purpose of inducing the plaintiff to act. *Id*. A representation may be made by words, actions or other conduct amounting to a statement of fact. *Id*. A fiduciary relationship is not necessary to establish fraud. See *In re Estate of Kaminski*, 200 Ill. App. 3d 309, 318 (1990).

¶ 58     Here, the trial court found that the Swansons committed fraud against Stump by creating an LLC that did not include Stump as a member. We agree. Donald Sr. and Donald Jr. made affirmative representations that the loan proceeds from the Mokena property would be held by an LLC of which Stump would be a 50% member, inducing Stump to convey the property to them and their company. While negotiations were going on between Stump and Donald Sr. concerning the terms of the proposed LLC, Donald Sr. and Donald Jr. formed, without telling Stump they were doing so, Mokena Investment Company I in which they were the only members. They were also the only persons listed on the only bank account designated for receipt and disbursement of the loan proceeds. Stump was injured by his reliance on their

_____

[1]No statutory objection has been raised as to the Swansons' personal liability. There is a statute which appears to be directly on point. See 805 ILCS 180/10-10(a), (d), 13-10 (West 2010). The statute has not, however, been raised and its possible effect has not been briefed so we deem it waived and do not consider it.

- 11 -

representations because he deeded his property for the benefit of a company in which he had no interest. The trial court's finding of their personal liability for the actual damages resulting from the fraud is not against the manifest weight of the evidence.

¶ 59                    B. Personal Liability for Breach of Contract

¶ 60    We next consider the Swansons' argument that they should not be individually liable for breach of contract on the Mokena project because they were not parties to the contract. Stump concedes that although the companies are liable for breach of contract, Donald Sr. and Donald Jr. cannot properly be held personally liable. We do not read the trial court's order as imposing damages for breach of contract. The finding of breach was made in conjunction with the court's discussion of whether the statute of frauds precluded relief for Stump because of the absence of a written contract. The court found that it did not and then went on to find that the oral contract induced by fraud was voidable, that Stump sought to void it through rescission, and that rescission was warranted. The court granted rescission and found that, in order to be made whole, Stump was entitled to compensatory damages equal to the amount of the bank's lien ($2,612,216.67). It was this compensatory damages amount that was assessed against Swanson Development, Mokena Investment Company I, trust No. 2184, as well as Donald Sr. and Donald Jr., individually. There has been no challenge to this award. The trial court's award of this relief is affirmed.

¶ 61                    C. Assessment of Punitive Damages

¶ 62    Finally, we consider the propriety of imposing punitive damages against Donald Sr. and Donald Jr. They argue that there was no evidence that they committed fraud against Stump related to the Mokena property because Stump knew or should have known he was not a member of an LLC when he attended the closing. Additionally, they argue that silence, particularly on the part of Donald Jr., is insufficient to establish fraud.

¶ 63    Stump responds that punitive damages were properly awarded against the Swansons for their fraudulent acts and further asserts that Swanson Jr. was not found liable for his silence, but for his active participation in the fraudulent conduct.

¶ 64    Punitive damages are not favored in the law. *Petty v. Chrysler Corp.*, 343 Ill. App. 3d 815, 828 (2003). "A court may award punitive damages if the defendant's tortious acts are malicious or display reckless disregard for another's rights." *Id*. "The purpose of punitive damages is to punish the defendant and deter others from the same conduct ***." *Id*. Punitive damages should only be awarded in cases with aggravated circumstances–such as fraud, willfulness, wantonness, or malice–and "should not be awarded if the defendant's misconduct is not above and beyond the conduct needed for the basis of the underlying cause of action." (Internal quotation marks omitted.) *Id*.

¶ 65    "To determine whether punitive damages are appropriate, the trier of fact can properly consider the character of the defendant's acts, the nature and extent of the harm to the plaintiff that the defendant caused or intended to cause and the wealth of the defendant." (Internal quotation marks omitted.) *Slovinski v. Elliott*, 237 Ill. 2d 51, 58 (2010). Evidence of the

defendant's financial status is necessary for an appellate court to properly review a challenge to an award of punitive damages. *Powers v. Rosine*, 2011 IL App (3d) 100070, ¶ 14. "A trial court must evaluate available evidence of a defendant's financial worth in calculating punitive damages, but an award will not be overturned just because the defendant did not present evidence of financial worth at trial." *Gambino v. Boulevard Mortgage Corp.*, 398 Ill. App. 3d 21, 69 (2009).

¶ 66    In reviewing a trial court's decision to award punitive damages, the appellate court must take a three-step approach, "considering (1) whether punitive damages are available for the particular cause of action, using a *de novo* standard, (2) whether, under a manifest weight of the evidence standard, the defendants acted fraudulently, maliciously or in a manner that warrants such damages, and (3) whether the trial court abused its discretion in imposing punitive damages." *Linhart v. Bridgeview Creek Development, Inc.*, 391 Ill. App. 3d 630, 641 (2009).

¶ 67    A plaintiff has a common law right to punitive damages in a fraud case. *Cripe v. Leiter*, 291 Ill. App. 3d 155, 159 (1997). Thus, the first factor is satisfied here.

¶ 68    Turning to the second factor, we review the trial court's reasons for imposing punitive damages to determine if its judgment was against the manifest weight of the evidence. See *Linhart*, 391 Ill. App. 3d at 641. Here, the trial court found that Donald Sr. and Donald Jr. were actively involved in the fraud committed against Stump. We agree. In direct contravention of the oral agreement with Stump, they created Mokena Investment Company I weeks prior to the August closing, they made themselves the sole members of the company and the sole recipients of loan proceeds, they excluded Stump from 50% (or any) membership in the company, and they did not tell him any of this. In addition, Stump testified that he did not know of the formation of the LLC prior to closing–testimony the trial court clearly found credible. Therefore, we do not find that the trial court's award of punitive damages is against the manifest weight of the evidence. Moreover, any doubts Stump might have had about whether the documentation would be completed were allayed by three factors: Donald Sr. repeatedly represented that the documents would be completed after the closing; active negotiation on the creation of the LLC with Stump as a member was ongoing prior to the closing; and Donald Sr. assured Stump at the closing that the documents, including the LLC operating agreement, would be completed after the closing. At no time did he tell Stump such an agreement was already in effect and in the possession of the bank.

¶ 69    As further evidence of culpable personal conduct, we note that Donald Sr. gave Stump personal financial statements that he had previously prepared and that he knew were false for the purpose of calming him down so he would continue to go forward on the Mokena project. We further note that both Swansons played fast and loose with the LLCs and with the loan proceeds. None of the organizational formalities for LLCs were followed with Peotone Properties and Mokena Investment Company I, including noticing and recording meetings, keeping books, and strictly observing who was authorized to sign documents and loan applications on behalf of the LLCs. All loan proceeds were funneled into Swanson Development and mixed with monies from other sources and used indiscriminately for all of the Stump projects. In addition, $500,000 was used as a nonrefundable down payment for land for the Petratos project. Stump and O'Malley denied Stump was a party to that project and his

name did not appear in any of the documents. Donald Sr.'s testimony about Stump's possible involvement was equivocal at best. Clearly, however, the money came from proceeds from Stump's land and it was diverted from the Mokena development and was lost through Donald Sr.'s actions.

¶ 70    We consider, as the third factor, whether the trial court abused its discretion by awarding punitive damages. In determining whether punitive damages are appropriate, the trial court was required to assess not only the nature and extent of the harm to plaintiffs but also the wealth of defendants. See *Slovinski*, 237 Ill. 2d at 58. Here, there was evidence, albeit conflicting, from personal financial statements and credit reports regarding the wealth of the Swansons. This information included the fact that Donald Jr. was living in a $300,000 home and that Donald Sr. had purchased a luxury car and a utility vehicle from loan proceeds which were to be used for development of the Mokena property. Both had also taken substantial amounts of money from loan proceeds for their personal use. In addition, three of Donald Sr.'s personal financial statements claimed, variously, assets totaling $3,048,000, $4,603,000, and $8,230,000 without liabilities, showed interests in other LLCs; and reported additional personally held real property. A personal financial statement prepared for Donald Jr. by his father listed a net worth of $595,000 without liabilities. It is possible that not all of the claims are false. After consideration of the foregoing facts, suggesting an ability to pay, and the clear evidence of harm caused to Stump by the Swansons' conduct, we cannot find that the trial court abused its discretion in ordering Donald Jr. and Donald Sr. to pay punitive damages. The imposition of personal and punitive damages challenged in appeal No. 3-11-0784 is affirmed.

¶ 71           II. The Stump Consolidated Appeal–Appeals Nos. 3-11-0785 and 3-12-0086

¶ 72    Stump has raised two issues in this appeal. The first is his contention that, because the bank was on "inquiry notice" of Stump's interest in the property prior to making the Frankfort and Mokena loans, the bank was not a *bona fide* "purchaser" whose mortgage lien could properly be superior to Stump's vendor's liens or to his title to the Mokena property that was restored to him when the court granted his prayer for rescission. Stump's second issue is that waiver does not stand as a bar to his Frankfort and Mokena claims. We consider the two issues together.

¶ 73           A. Equitable Vendor's Liens Were Created in This Case

¶ 74    The specific findings made by the court and challenged by Stump as to count IV were that Stump held an equitable lien against the Swanson defendants on the Frankfort property but that the bank's mortgage lien was superior. On counts VIII and IX, the court granted Stump's claim for rescission of his oral contract and deed but, again, held the bank's lien was superior to Stump's restored title. After entry of the judgment, the trial court authorized foreclosure by the bank of its mortgages and validated the sale of the property to the bank. These latter judgments are included in the consolidated appeals.

¶ 75    Stump asserts that the key to the resolution of his challenge to the foreclosure decisions is the understanding and application of the concept of "inquiry notice." He argues that for several enumerated reasons grounded in irregularities disclosed in the loan application process, the bank was on inquiry notice of Stump's prior ownership interest and of the fact that the

purchase price on the properties had not been paid; because of the inquiry notice, the bank is charged with knowledge of all facts it could have learned through prudent inquiry; because of its imputed knowledge, the bank is not a *bona fide* "purchaser" without notice of any interest of others in the land; and because the bank is not a *bona fide* purchaser, its liens are subordinate to the vendor's lien (Frankfort) and title (Mokena) held by Stump.

¶ 76      The bank responds that: it is a *bona fide* purchaser without notice and its mortgage liens have priority; inquiry notice is irrelevant in this case because Stump failed, by act and omission, to create a vendor's lien and there was nothing to find; even if a lien had been created, it was waived; and a vendor's lien is not an interest in property but rather is "merely a remedy for the debt." The bank also argues that finding a vendor's lien in this case would change existing law and eviscerate the Conveyances Act (765 ILCS 5/1 *et seq.* (West 2010)).

¶ 77      Over more than a century of consideration, the case law concerning vendor's liens has become complex and confusing–a fact amply demonstrated by the complexity of the trial court's underlying findings and the parties' appellate briefs. Therefore, we begin our consideration with an examination of the equitable vendor's lien itself.

> "A vendor's lien does not grow out of an agreement between the parties, but is simply an equity raised by courts of chancery for the benefit of vendors of realty, *which will be enforced or denied as the exigencies of each particular case may require*, and rests on the principle of natural justice that one obtaining possession of another's estate ought not in conscience to be allowed to keep it without paying the consideration. [Citation.] A vendor's lien is not recognized by our statute, but is a creature of the courts of equity, [citation], and such liens are created to prevent injustice which can arise when one parts with an interest in land and the purchaser retains the realty but refuses to pay. [Citation.]" (Emphasis added.) *Mills v. Mills*, 27 Ill. App. 2d 50, 57-58 (1960).

See also *Fischer v. Abernathy*, 206 Ill. App. 278, 282 (1917) (a vendor's lien is a lien recognized in equity that "arises in cases where the owner of land conveys the same by deed, thus divesting himself of the legal title, and where some part or all of the purchase price remains unpaid").

¶ 78      In its decision in *Ross v. Clark*, 225 Ill. 326 (1907), the supreme court stated: "The vendor's or grantor's lien is only permitted as security for unpaid purchase money, which must be a certain, ascertained amount. The lien does not exist in behalf of any contingent, uncertain or unliquidated demand. [Citation.]" *Ross v. Clark*, 225 Ill. at 331. Similarly, the appellate court in 1960 said in *Mills*: "A vendor's lien is viewed with disfavor and will not be enforced unless clearly established, and will only be permitted as security for unpaid purchase money. [Citation.]" *Mills*, 27 Ill. App. 2d at 58.

¶ 79      These principles gleaned from older cases were reiterated when the appellate court revisited equitable vendor's liens more recently in *Krajcir v. Egidi*, 305 Ill. App. 3d 613 (1999). In that case the court described the vendor's lien as follows:

> "In cases where a lien has not been reserved expressly, a lien is raised in equity in favor of the vendor who has parted with legal title without receiving payment of the full

- 15 -

purchase price; it arises in every sale and conveyance of land when the purchaser has not paid in full. [Citation.] Such an implied lien is not an interest or estate in realty or a specific, absolute charge thereon, but an equitable right in the vendor by a proceeding in chancery to resort to the property in case the purchase price is not paid; it is not a debt or right of property, but merely a remedy for the debt which is limited to the property or interest therein sold. [Citation.]" *Krajcir*, 305 Ill. App. 3d at 626.

While the language in the cited cases does recognize a security interest, it is an equitable interest which creates a remedy against the defaulting vendee for the unpaid purchase money. It is not an interest *in* the land.

¶ 80        In the instant case, as in *Krajcir*, Stump asserts that he retained no mortgage or other express reservation of interest in the property, but that title did pass through the sale to Swanson Development to the trust and the agreed-upon purchase price was not paid. Accordingly, an equitable vendor's lien would arise in favor of Stump which he could assert against the Swanson defendants by a proceeding in chancery, resorting, *in appropriate circumstances*, to the property for relief. See *Mills*, 27 Ill. App. 2d at 57.

¶ 81        Although Stump failed to protect his right to be paid by establishing and recording a *legal* lien to give notice of his preserved property interest to persons reviewing the chain of title, there is ample evidence in the record, including the Prairie Creek I and II agreements, that the parties had agreed upon a definite purchase price ($1,460,250) for the Frankfort property and that Stump intended to be paid by Swanson Development Company or its privies for that property by December 31, 2007. Similarly the record establishes that Stump was to be paid $4,500,000 for the Mokena property and the sources, method and partial timing for payment of the purchase price. The parties do not dispute these facts. There is, therefore, a clearly established debt for an amount certain with regard to both properties and proof that it has not been fully paid.

¶ 82        The cases we have previously cited indicate that equitable vendor's liens exist solely to protect a seller of land who conveyed his property but has not retained and recorded a legal interest and who has not been paid, by creating a mechanism recognized in equity by which he can compel payment of the purchase price by his vendee. Consistent with that fact, the trial court in the instant case declared the existence of an equitable vendor's lien that could be asserted by Stump to secure payment of the purchase price for the Frankfort property by the purchaser. We find no error in this decision. Equity would approve the creation of the vendor's liens in conjunction with the Frankfort property.

¶ 83                            B. Stump's Liens Were Not Waived

¶ 84        The bank contends, and the trial court stated, that Stump waived his vendor's lien by providing good and merchantable title, signing closing documents showing that consideration was paid in full, failing to reserve a lien in the contracts, failing to record a lien, and failing to let the world know that a vendor's lien existed. The bank also argues the lien was waived because Stump induced another (presumably the bank) to deal with the property as unencumbered.

¶ 85    Stump initially challenges the bank's right to even raise this argument because waiver was not included as an affirmative defense in the bank's answer. It is true that the defense was not separately pled as required by section 2-613(d) of the Code of Civil Procedure (735 ILCS 5/2-613(d) (West 2010)).

¶ 86    The bank responds that it did raise the issue in its pleadings, that Stump introduced testimony and exhibits at trial related to waiver, and that he failed to object to any of the bank's waiver arguments at trial.

¶ 87    Although Stump denies that the testimony and evidence referred to by the bank was introduced at trial for the purpose of refuting the bank's waiver arguments, we find no indication in the record that he filed any motion prior to the trial court's decision objecting to the failure to plead the separate affirmative defense. It seems apparent that the pleading defect was not brought clearly to the attention of the judge and, for the court, the possible waiver of Stump's vendor's liens was in issue and ripe for resolution. In that circumstance, we find Stump has waived the bank's alleged waiver of its waiver defense. *American Family Mutual Insurance Co. v. Albers*, 407 Ill. App. 3d 569, 574 (2011) (holding that a plaintiff waives any objection to defendant's failure to plead an affirmative defense by failing to object at the trial level). We now turn to the merits of the bank's waiver argument.

¶ 88    Because vendor's liens are disfavored, whenever, from any circumstances, a court can infer that a vendor did not rely on his lien for security, the court should treat it as waived. *Franklin v. Hillsdale Land & Cattle Co.*, 70 Ill. App. 297, 302 (1897). The main principle that governs courts of equity in enforcing a vendor's lien is the implied agreement existing between the vendor and the vendee that the former shall hold a lien on the lands sold for the payment of the purchase money. *Id*. When, therefore, it appears that the vendor did not rely on the lien, this does away with that implied agreement, and courts hold the lien waived. *Id*.

¶ 89    A vendor's lien is waived if the vendor (1) takes other security for the purchase money, or (2) performs an act manifestly declaring an intention not to rely on the lien. *Wendell v. Pinneo*, 127 Ill. App. 319, 323 (1906). The burden of proof of the waiver rests upon the party alleging it. *Id*.

¶ 90    The bank's argument that giving a warranty deed defeats the vendor's lien is incorrect. It is in just such a situation that equity creates the lien. *Krajcir*, 305 Ill. App. 3d at 626. Similarly, the contention that conveyance of the Mokena property by quitclaim deed divested the lien lacks merit. A quitclaim deed divests the vendor of every interest, including equities, that he possesses at the time the property is conveyed. See 765 ILCS 5/10 (West 2010) ("Every [quitclaim] deed *** shall be deemed and held a good and sufficient conveyance, release and quit claim *** in fee of all of the *then existing legal or equitable rights of the grantor ****." (Emphasis added.)). The quitclaim deed cannot divest the vendor of an equitable interest, such as Stump's equitable lien, which does not come into being until after the property is sold and some or all of the purchase price remains unpaid.

¶ 91    We also find no acts by Stump clearly showing his intention to waive his vendor's lien. Indeed, there is evidence that he grew increasingly worried that he would not be paid and took unsuccessful steps to secure payment of his purchase price. The fact that Stump did not record his lien documents in the chain of title cannot constitute a waiver because, by its definition, a

vendor's lien is not a property interest and is not recordable. No argument has been made that the vendor's liens were extinguished in any manner as to Donald Sr., Donald Jr., and Swanson Development. It is undisputed that Stump had no relationship and no dealings with the bank. He did not "induce" it to deal with the property as unencumbered.

¶ 92     Although the trial court stated that plaintiffs had waived their liens, we do not find that to be the import of the order. The court found that the liens had been created and they remained enforceable against the Swanson defendants–a fact which is inconsistent with a finding of waiver. We believe that what the court actually, and properly, found *as to the bank*, albeit in different terms, is that the same acts and omissions that led to the creation and continued viability of Stump's vendor's lien had cost Stump any right to enforce his lien against the bank.

¶ 93                    C. Applying Inquiry Notice to Vendor's Liens Is Not Equitable

¶ 94     Stump, nonetheless, persists in seeking to extend the reach of his implied vendor's liens beyond his purchaser to reach a stranger to the sale/purchase transactions (the bank) and to compel relinquishment or reduction of that stranger's mortgage lien interest in the property. He thus argues that an equitable vendor's lien can be used to actually wrest a legal property interest from the possession of a third party.

¶ 95     More than a century ago, our supreme court indicated that such a situation should not be countenanced:

> "A vendor's lien, in general, is viewed with disfavor, having arisen in times whose peculiar conditions and institutions were alien to our own. It is from its nature secret and unknown to the world,–often productive of harm. [Citations.] This court has therefore frequently held that the rights under such a lien ought not to be enforced except where they are distinctly and clearly made out; *that they should not be extended beyond the requirements of the settled principles of equity.* [Citations.]" (Emphasis added.) *Ross*, 225 Ill. at 330-31.

In a similar vein, the supreme court and the appellate court have urged restriction of the reach of vendor's liens, stating that these secret liens on real estate often produce injustice and should not be encouraged, and that respect to third parties, the doctrine of implied liens should not be extended or enlarged. *Franklin*, 70 Ill. App. at 302; *Trustees of Schools v. Wright*, 11 Ill. 603, 607 (1850).

¶ 96     It seems clear from these cases that Illinois courts have long looked with disfavor not only on the equitable vendor's lien itself but also on its extension beyond the actual parties to the sale. Because attempts to address this concept in more recent years have resulted in a complex and confusing jurisprudence, we undertake a more fundamental analytical approach.

¶ 97     In the instant case, the bank has no vendor/vendee relationship with Stump in regard to either the Frankfort or Mokena property and no equitable vendor's lien could, by definition, arise independently as to the bank, nor does Stump claim that one has. The question then becomes whether, and on what basis, Swanson's equitable or moral obligation to pay the agreed-upon purchase price to Stump can be imposed upon the bank as an obligation substantial enough to supercede the bank's legal mortgage liens and cause the property–now

legally owned and mortgaged by another–to be the source of payment to Stump or to revert to Stump.

¶ 98    Stump maintains that such a shift of responsibility can be effected because the concept of "inquiry notice" applies to defeat the good faith or *bona fide* nature of the bank's actions in making the loans and securing its mortgage liens. He contends the bank had constructive knowledge, through its own actions and omissions, of his vendor's lien and it could not, therefore, be a *bona fide* purchaser. We cannot agree with Stump's argument for the following reasons.

¶ 99    Stump asserts that his position that the bank can be charged with knowledge of his vendor's lien is supported by the Conveyances Act, specifically citing section 30 of the Act. 765 ILCS 5/30 (West 2010). In response, the bank expresses concern that if we find this vendor's lien exists and is enforceable, we will have changed Illinois law and the Conveyances Act will be "eviscerated."

¶ 100   We do not find that Act to be implicated in any analysis of vendor's liens. The Act's effect is set out in section 30, cited by Stump, which provides:

> "All deeds, mortgages and other instruments of writing which are authorized to be recorded, shall take effect and be in force from and after the time of filing the same for record, and not before, as to all creditors and subsequent purchasers, without notice; and all such deeds and title papers shall be adjudged void as to all such creditors and subsequent purchasers, without notice, until the same shall be filed for record." 765 ILCS 5/30 (West 2010).

*Krajcir* plainly states that the vendor's lien is not an interest or estate in the property. *Krajcir*, 305 Ill. App. 3d at 626. Nor, by definition, is it an "instrument[ ] of writing which [is] authorized to be recorded." 765 ILCS 5/30 (West 2010). Therefore, the Act's plain language precludes its application to the equitable vendor's lien. Moreover, since it is not a written document, such a vendor's lien cannot be discovered in a reasonable search of the chain of title. Hence the supreme court's characterization of it as "secret." *Ross*, 225 Ill. at 330. Indeed, Stump's security interest did not appear in the title search undertaken by Chicago Title on behalf of the bank.

¶ 101   Finally, with regard to the Conveyances Act, even if its language did not disallow it, the inclusion of equitable vendor's liens within the Act's coverage would frustrate its purpose. *In re Hill*, 156 B.R. 998, 1009 (Bankr. N.D. Ill. 1993) ("The primary means of charging any party with notice of an interest in Illinois real property is to record that interest."); *Cabeen v. Breckenridge*, 48 Ill. 91, 93-94 (1868) ("It is the obvious design of our recording laws, to protect purchasers from latent legal or equitable titles."); *King v. De Kalb County Planning Department*, 394 Ill. App. 3d 699, 704-05 (2009) (the purpose of the Conveyances Act is to give third parties the opportunity to ascertain the status of title to the property and to protect subsequent purchasers against unrecorded interests). The protection intended by the Conveyances Act is also extended to mortgage lenders. *In re Ehrlich*, 59 B.R. 646, 649-50 (Bankr. N.D. Ill. 1986) (the Act protects "*bona fide* mortgagee[s] for value" (applying Illinois law)).

¶ 102    The equitable vendor's lien is not recognized by statute but is solely a creature of the courts of equity. *Mills*, 27 Ill. App. 2d at 57. Therefore, Stumps' reliance on the Conveyances Act is unavailing. We find no *legal* justification for applying inquiry notice to vendor's liens.

¶ 103    We, therefore, consider whether equity would approve the application of inquiry notice to the equitable vendor's lien.

¶ 104    Under the concept of inquiry, or constructive, notice, a person will be charged with notice when that person has knowledge of facts or circumstances that would cause a person of prudence to make further inquiry. *Glenview State Bank v. Shyman*, 146 Ill. App. 3d 136, 138 (1986). If that person does not investigate further, he or she will be charged with notice of any facts that may have been discovered by the inquiry. *Id*. A purchaser is placed on "inquiry notice" when facts revealed in the title search process would cause a reasonable individual to think twice about completing the transaction. *In re Application of the County Collector*, 397 Ill. App. 3d 535, 549 (2009). Nothing irregular was revealed in the title search.

¶ 105    Stump acknowledges that the bank owed him no duty and that there was neither a contractual nor a fiduciary relationship between him and the bank that gave rise to obligations on the bank. His attempt to prioritize his vendor's lien over the mortgage liens is solely grounded in his assertion of "inquiry notice." Our analysis of this argument has two prongs: we first consider what kind of notice is required to impute knowledge of the intangible equitable vendor's lien to and, ultimately and in essence, shift the obligation for payment of the unpaid purchase price onto a third party, not privy to the sale/purchase transaction. For reasons of judicial economy, we consider, second, whether inquiry notice, if applicable in this case, would have caused the bank to reconsider making the loan.

¶ 106                        1. Type of notice necessary to bind third parties

¶ 107    Generically, a vendor asserting an equitable lien comes into court without having taken the most elemental legal steps to protect his interest in being paid for his property. There is no written preservation of a property interest, no recording to apprise a future purchaser or mortgagee that the seller retains any kind of interest in or against the property. He has only a gentleman's agreement and an intangible right to be paid, created in equity and characterized by the courts of chancery as a "lien," between himself and his vendee. On what basis might equity impose an obligation on a stranger to the original transaction to attempt to ferret out a *possible* retained interest–not a property interest *in* land but a remedy for a debt assertable in a proper case by the vendor *against* the land–that is based on an oral agreement and a handshake, is not in writing and appears nowhere in the chain of title?

¶ 108    We find there is little or no equitable basis for such an extension of inquiry notice or for such a burden on transfers of property or interests therein.

¶ 109    Although we have cited cases in which Illinois Supreme and Appellate Courts have expressed disapproval of the very concept of equitable vendor's liens, have indicated that such liens have on occasion been the cause of injustice, and have voiced a belief that they should not be extended to third parties, we have not found any recent case in which our supreme court has directly addressed the scope and function of such a lien. We, therefore, assume its continued

viability. However, because it exists outside of the normal statutory framework crafted by the legislature for facilitating and protecting transfers of property and because it can frustrate the certainty and freedom of alienation of property interests, we believe the supreme court, faced with this issue, would limit its reach.

¶ 110    We, therefore, hold that the concept of inquiry notice is not applicable to equitable vendor's liens and that the only time–*if at all*–a purchaser of a property interest who is a stranger to the original transaction can be burdened with the original vendee's equitable–essentially moral–obligation for the unpaid purchase price is when the subsequent purchaser or mortgagee for value has *actual* knowledge about the prior purchase that would render his own purchase or mortgage tantamount to complicity in fraud. Stump does not claim the bank had actual notice.

¶ 111    Our conclusion finds some support in a 1926 supreme court decision involving not a vendor's lien but an unrecorded deed, which should be easier to uncover than an equitable vendor's lien. The court stated:

> "The title of a purchaser whose deed has been recorded will not be postponed to a prior unrecorded conveyance except upon clear proof of actual notice of the earlier deed or of circumstances which should have induced an honest and prudent purchaser to make inquiry which would have disclosed the truth. *Mere suspicion will not establish an inference of fraudulent intent. The proof must be so clear that the inference of bad faith is a necessary conclusion.*" (Emphasis added.) *Cessna v. Hulce*, 322 Ill. 589, 597 (1926).

¶ 112    More specifically, in the instant case, not only has Stump not documented or recorded his retained interest in the properties in the chain of title, he agreed to (and did) convey unrestricted title, ostensibly representing that the consideration had been paid, for the purpose of allowing Swansons to do precisely what they did–use the property as collateral for loans. Because he wanted to remain in the background, Stump deliberately obscured his relationship to the property. Moreover, neither he nor his legal representative ensured that his financial interests were secured either by membership in the LLCs formed to receive loan proceeds or by the execution of development agreements documenting the sale, thereby further obscuring his retained interest in the land.

¶ 113    Stump clearly did not anticipate the fraud of his vendees, which the trial court found and which is unchallenged in this appeal. We sympathize with his plight because of the magnitude of his loss and the position in which he now finds himself because of misplaced trust in the Swansons. However, the position is largely one of his own making, created by his own actions and omissions and those of his grandson/attorney described above. In equitable terms, with respect to third parties, Stump lacks "clean hands" because he substantially enabled the fraud perpetrated against him by the Swansons and prevented the bank from discovering his connection to the property.

¶ 114    Stump's argument can be construed as a claim that it is the bank that lacks clean hands because it ignored its own policies and applicable federal regulations in underwriting the loans on the Frankfort and Mokena properties and allegedly willfully closed its eyes to substantial evidence of Swansons' fraud. He asserts that, in violation of the bank's own policies and

because of Merlin Karlock's conflict of interest: there was only one officer of the bank performing its due diligence where there should have been two; Catherine Boicken exceeded the limit of her individual lending authority; Boicken also ignored gross and obvious inaccuracies in the several personal financial disclosures of Donald Sr. and Donald Jr. and serious discrepancies between those disclosures and their credit reports that she secured. While all of those allegations appear to be true, they relate to duties owed by its agents to the bank and its shareholders. In the final analysis, even though all of its policies were not carefully followed, the bank adequately protected its interests by commissioning a title search which disclosed no clouds on title, ascertaining that the appraised value of the collateral equaled or exceeded the amounts of the loans it was making, and assuring itself that its lien stood in first position.

¶ 115    As Stump has acknowledged, the bank had no duty to nor contractual or fiduciary relationship with him. It had no obligation to delve into the details of the underlying sale of the property by Stump to Swanson Development Company. Again in equitable terms, the bank has clean hands with regard to Stump. We find nothing in the bank's flawed underwriting of the loans that constitutes actual notice that Stump's purchase price had not been or was not being timely paid; that Stump was being victimized by his buyers; that vendor's liens had arisen on behalf of Stump which might be assertable against the properties; that there was any interest or estate in the land existing prior to its own; or that by completing the loans it was being complicit in fraudulent conduct.

¶ 116             2. Inquiry notice, even if applicable, would not help Stump

¶ 117    Recognizing that this case may undergo further review and that the supreme court may disagree with the sweep of our decision, and in the interest of judicial economy, we consider what further inquiry by the bank may have shown. In the instant case, the actual transaction in which the bank was involved was making loans to Swanson Development Company through Peotone Properties, and Mokena Investment Company I, LLC, as trust beneficiaries, for which the Frankfort and Mokena properties were collateral. If, *at the time the loans were being sought and made*, the bank had spoken with Stump or otherwise followed up on any of the information Stump now claims was available to it, it would have found nothing that would have disclosed Stump's vendor's liens.

¶ 118    Rather, it would have found that Stump and his wife, through their trust, had been the owners of the Frankfort and Mokena properties; that Stump had voluntarily entered into plans for development projects with Donald Sr., Donald Jr., and Swanson Development Company; that as part of their agreements, Stump would sell the properties to Swanson Development Company for the purpose of using them as collateral for loans whose proceeds were to partially pay Stump for the property and to facilitate the two development projects; that, pursuant to the agreement, Stump had conveyed unrestricted title to the Frankfort property (warranty deed) and the Mokena property (quitclaim) deed to trusts set up for the purpose of facilitating loans; that Stump–*like the bank*–did not initially anticipate collecting his purchase price from the personal assets of the Swansons, but rather from loan proceeds and fruits of the development projects to be generated by Swansons through the creation of beneficiary LLCs and through

the use of his property and their expertise and experience; that Stump was looking to the loan proceeds and to the profits from the development of the property as the source of his purchase price; and that, although the Frankfort purchase price had not been paid, it was not due until December 31, 2007, and, except at the time of the February 2008 Mokena loan, was not yet delinquent. In short, the bank would have found a plan that was apparently being carried out as the parties to the development projects had envisioned. There would have been nothing in this discovery to cause a prudent lender to suspect the existence of vendor's liens or to refuse to make the loans.

¶ 119　　Moreover, there was nothing about the title documents or the conditions of the properties, such as possession by another, that would have led the bank to inquire further about the properties' ownership. We find nothing in the title search that should have put the bank on inquiry notice that could lead to the knowledge (or a reasonable suspicion) that the property had not been legitimately conveyed to Swanson Development Company or that the purchase price would not be paid as Stump contemplated.

¶ 120　　Plaintiffs' assertion that the bank should have questioned how the defendants purchased the properties puts an undue burden on the bank. Because Swanson Development Company held title to the properties and the documents did not show that consideration had not been paid as contemplated, the bank had no obligation to inquire further and its duty ended with its title search and appraisals.

¶ 121　　　　　　　　　D. Effect of Restoration of Mokena Title

¶ 122　　Finally, we consider, very briefly, the possible effect on the bank of the restoration of Stump's title to the Mokena property following the judgment of rescission based on fraudulent inducement. As a result of the rescission, the court declared the oral agreement of the parties and the deed to the Mokena property cancelled. Title was restored to Stump but the trial court held the "Bank's lien is properly first in time and thus, takes priority over any ownership interest of Plaintiffs."

¶ 123　　We deal here purely with a question of notice. Stump's position is analogous to that of the person referred to in section 30 of the Conveyances Act who holds a legal interest but has not recorded it. At the time the bank commissioned and Chicago Title completed the title search, Stump had no recorded ownership interest in the property. Neither actual nor inquiry notice could have disclosed that Stump would file a lawsuit asserting fraud and that he would prevail, thereby recovering title to his property. Stump's title would not appear as current in any search of the chain of title at the time the loans were made. Thus, with regard to the Mokena property, the bank was a *bona fide* mortgagee for value without notice of Stump's restored title.

¶ 124　　For the foregoing reasons, the bank was entitled to foreclose its mortgages on the properties and the trial court's judgment to that effect is affirmed.

¶ 125　　　　　　　　　　　　　　CONCLUSION

¶ 126　　On the Swanson appeal, the trial court's judgment against Donald Sr. and Donald Jr. based on their personal liability for fraud in the inducement is affirmed; their personal liability for

compensatory damages following rescission of the oral Mokena agreement is affirmed; and the award of punitive damages is affirmed.

¶ 127 On the Stump appeal, we affirm the court's judgment that the bank is entitled to foreclose its mortgage liens and affirm its orders authorizing and confirming the sales of both the Frankfort and Mokena properties to the bank.

¶ 128 No. 3-11-0784, Affirmed.

¶ 129 Nos. 3-11-0785 and 3-11-0886, Affirmed and remanded.